NOT DESIGNATED FOR PUBLICATION

No. 123,453

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Opinion filed September 3, 2021.
Affirmed.

*Paige Bangerter*, of PAB Legal, P.A., of Dodge City, for appellant natural mother.

*Kathleen Neff*, deputy county attorney, and *Kevin Salzman*, county attorney, for appellee.

Before WARNER, P.J., CLINE, J., and WALKER, S.J.

PER CURIAM: Mother appeals from the district court's order terminating her parental rights over her daughter B.M. On appeal, Mother argues that the district court wrongfully terminated her parental rights and contends that the district court's findings in support of its termination ruling were inadequate for several reasons. Because none of Mother's arguments are persuasive to us, however, we affirm the district court's order of termination.

FACTS

B.M. was born to Mother in 2015. In addition to B.M., Mother has two other daughters—L.M., born in 2002, and D.M., born in 2003—who had child in need of care (CINC) cases pending at the same time as B.M.'s CINC case. L.M.'s father was not involved in her CINC case. On the other hand, D.M. and B.M.'s father, who is currently

1

in prison for committing aggravated indecent liberties with a child against L.M. in 2015, had his rights over D.M. and B.M. terminated at the same time Mother had her rights over the children terminated. But the termination of D.M. and B.M.'s father's parental rights is not at issue in Mother's appeal.

Around mid-2017, Mother began a romantic relationship with R.L. Eventually, Mother and R.L. decided to share an apartment. Although it is unclear from the record on appeal when Mother and R.L. moved in together, it seems that they were residing in the same apartment within a few weeks of starting their relationship. Inside this apartment, there was a single bed, which Mother, R.L., L.M., and D.M. shared. B.M. did not share this bed because she had been living with her "babysitter" since she was two-and-a-half months old.

In mid-June 2019, L.M. and D.M. told a friend's mother about a number of occasions when R.L. had engaged in inappropriate sexual activity with them. After police were contacted, officers interviewed L.M. and D.M. Following the police interviews, a police officer spoke with Mother. According to this officer's report, Mother initially denied having any knowledge about L.M.'s or D.M.'s sexual abuse allegations against R.L. Later during her conversation with the officer, though, Mother admitted that L.M. "had told her that [R.L.] was touching her." But at that time, Mother also told the officer that she did not believe L.M. She asserted that L.M. falsified the sexual abuse allegations against R.L. because L.M. wanted to destroy Mother's romantic relationship with R.L.

It is unclear from the record on appeal whether R.L. was convicted of any crime related to his alleged sexual touching of L.M. and D.M. Although there are references to R.L. being on probation and entering a plea agreement with the State, nothing definitively establishes that R.L. was convicted of any crime based on L.M.'s and D.M.'s sexual abuse allegations. Even so, the record on appeal supports that R.L. faced criminal charges for his alleged sexual touching of L.M. and D.M. Additionally, the State relied on L.M.'s and

D.M.'s sexual abuse allegations to petition the district court for emergency custody of L.M., D.M., and B.M.

Upon the State's petition for emergency custody of L.M., D.M., and B.M., the district court appointed a guardian ad litem to represent L.M., D.M., and B.M. and counsel to represent Mother. At the June 19, 2019 temporary custody hearing on the State's petition, the district court granted the State's petition. It specifically determined that the Kansas Department for Children and Families (DCF) should take temporary custody of L.M., D.M., and B.M. based on L.M.'s and D.M.'s sexual abuse allegations against R.L.

At the July 17, 2019 adjudication hearing, the district court found that there was clear and convincing evidence that L.M., D.M., and B.M. were children in need of care. As a result, it ordered Saint Francis Community Services (Saint Francis), a private social service agency that DCF contracts with to provide case planning services, to create case plans for L.M.'s, D.M.'s, and B.M.'s CINC cases. For L.M., the district court ordered Saint Francis to create a case plan that would allow her to age out of DCF custody upon her 18th birthday. For D.M. and B.M., though, the district court ordered Saint Francis to create a case plan with the dual goal of reintegration with Mother and adoption.

Saint Francis had its first case planning conference with Mother on July 8, 2019. For B.M.'s permanency plan, Saint Francis required Mother to engage in the following case plan tasks:  (1) to complete and document the completion of an age-appropriate parenting class, (2) to complete and follow the recommendations of a mental health assessment, (3) to participate in family therapy with her daughters, (4) to use appropriate consequences when disciplining her daughters, (5) to have all people residing with her complete a background check, (6) to prohibit all people with person offenses in their criminal history from residing with her, (7) to sign all necessary releases so it could review her case plan tasks progress, (8) to remain in regular contact with St. Francis, and

3

(9) to prohibit R.L. from having any contract with L.M., D.M., and B.M. Under this permanency plan, Mother was also allowed monitored weekly visits with B.M., which could become unmonitored should Mother prove she could keep B.M. safe.

Following B.M.'s initial case planning conference on July 8, 2019, the Saint Francis caseworker responsible for the case reported her conversations with Mother, L.M., and D.M. According to this caseworker, when she asked Mother if R.L. had left their shared apartment, Mother responded that "he [was] not leaving, [and] she [did not] want him to [leave]." This caseworker further reported that Mother said that she was willing to "sign her rights to [B.M.] over to the babysitter."

On August 6, 2019, Saint Francis held B.M.'s second case planning conference with Mother. With the exception of keeping in regular contact with Saint Francis, Mother had not completed or complied with any of her case plan tasks as of that date. Furthermore, the caseworker responsible for the case reported that Mother "allow[ed R.L.] around the girls" at their last visitation. It seems the caseworker believed that Mother had allowed R.L. around L.M., D.M., and B.M. because after her July 29, 2019 visitation with Mother, B.M. told her foster parent that Mother had driven her and her sisters to Mother's apartment "to drop off food for [R.L.]" As a result, at the August 6 case planning conference, Saint Francis amended B.M.'s permanency plan to prohibit Mother from having visitations with B.M. without its permission.

Subsequently, on October 11, 2019, in preparation for the October 23, 2019 review hearing on L.M.'s, D.M.'s, and B.M.'s CINC cases, Saint Francis filed a court report updating the district court on Mother's progress on her case plan tasks. Outside of starting an age-appropriate parenting class, Saint Francis reported that Mother had not completed or complied with her case plan tasks directed toward B.M.'s reintegration. The caseworker who submitted the court report also asked that the district court change

4

D.M.'s and B.M.'s permanency goal from the dual goal of reintegration with Mother and adoption to adoption only.

This caseworker explained that he was making this recommendation in part because Saint Francis had been told that Mother "asked her co-workers to help her raise money to get her girls back," but then used that money "to bond [R.L.] out of jail" on September 7, 2019. The caseworker noted that Saint Francis had information indicating that Mother was living with R.L. and taking him to his "probation appointments." The report also explained that recently, Mother stopped contacting Saint Francis, stopped returning Saint Francis' phone calls, and refused Saint Francis' request for a walk-through of her apartment. In his report, the caseworker stated that Saint Francis was "concerned that both [Mother] and [R.L. were] putting pressure on the girls to recant their reports of sexual abuse by [R.L.]."

The caseworker who submitted the court report did not explain why Saint Francis was concerned that Mother was pressuring L.M. and D.M. to recant their reports of sexual abuse by R.L. However, other documents from Saint Francis that were filed with the court indicate that on August 5, 2019, Mother took L.M. and D.M. to the local district attorney's office. And ultimately, Mother conceded that she brought L.M. and D.M. to the district attorney's office on that date because she wanted them to recant their sexual abuse allegations against R.L.

Although the transcript of the October 23, 2019 review hearing has not been included in the record on appeal, the journal entry of this hearing is available to us. According to this journal entry, the district court found that reintegration with Mother may no longer be a viable option for D.M. and B.M. based on Saint Francis' reports as well as its in-chambers conversation with L.M., D.M., and the guardian ad litem. Consequently, the court ordered that a permanency hearing on Mother's parental rights over D.M. and B.M. take place. The record also indicates that around the time of this

hearing, the district court also restricted Mother's contact with L.M., D.M., and B.M. to monitored phone calls only.

The district court scheduled the permanency hearing for November 20, 2019. In preparation for this permanency hearing, Saint Francis filed a court report, updating the district court on Mother's progress on her case plan tasks in B.M.'s CINC case. In it, the caseworker who authored the report commented that Mother had not fully completed or complied with any of her case plan tasks. Additionally, this caseworker revealed that when Saint Francis contacted Mother to schedule a meeting, Mother responded that "she [did] not want anything to do with [Saint Francis]" because it was "not allow[ing] her to see her children."

A transcript of the November 20, 2019 permanency hearing is also, unfortunately, not included in the record on appeal. Even so, the journal entry of this hearing has been included in the record. According to this journal entry, at the conclusion of the permanency hearing, the district court found that reintegration of D.M. and B.M. with Mother was no longer a viable goal. Although not entirely clear, it seems that the district court reached this finding based in part on evidence indicating that Mother remained in contact with R.L. Because the district court found that reintegration of D.M. and B.M. with Mother was no longer a viable goal, the district court scheduled a hearing on the termination of Mother's parental rights over D.M. and B.M.

On January 23, 2020, the State filed a petition to terminate Mother's parental rights over D.M. and B.M. with the district court. In this petition, the State argued that Mother was unfit to parent D.M. and B.M. and was unlikely to become fit to parent D.M. and B.M. in the foreseeable future for the following reasons:

(1)    because Saint Francis' reasonable efforts to reintegrate Mother with D.M. and B.M. had failed because of Mother's conduct as stated in K.S.A. 2020 Supp. 38-2269(b)(7);

(2)    because Mother had failed to adjust her circumstances, conduct, or conditions to meet D.M.'s and B.M.'s needs as stated in K.S.A. 2020 Supp. 38-2269(b)(8);

(3)    because Mother had failed to assure D.M.'s and B.M.'s care despite being able to do so as stated in K.S.A. 2020 Supp. 38-2269(c)(1);

(4)    because Mother had failed to maintain regular visitation, contact, and communication with D.M., B.M., and Saint Francis as stated in K.S.A. 2020 Supp. 38-2269(c)(2); and

(5)    because Mother had failed to carry out a reasonable reintegration case plan approved by the district court as stated in K.S.A. 2020 Supp. 38-2269(c)(3).

In alleging that Mother was unfit under K.S.A. 2020 Supp. 38-2269(b)(7)-(b)(8) and (c)(1)-(c)(3), the State pointed to evidence indicating that Mother remained in a romantic relationship with R.L. and that she had not completed or complied with most of her case plan tasks. The State then relied on this evidence to further allege that termination of Mother's parental rights over D.M. and B.M. was in their best interests.

After the State filed its petition to terminate Mother's parental rights over D.M. and B.M., COVID-19 forced the district court to delay Mother's termination hearing. In the meantime, Saint Francis continued to provide the district court updates on D.M., B.M., and Mother. Saint Francis reported that in early January 2020, Mother completed her case plan tasks of completing an age-appropriate parenting class and providing documentation of its completion. Additionally, it reported that Mother was now maintaining contact with St. Francis, attending individual therapy every other week, and signing all necessary releases. But it also commented that Mother had not technically complied with her remaining case plan tasks because those tasks had been discontinued

given the district court's order prohibiting in-person visitation between Mother, D.M., and B.M.

The hearing on the State's petition to terminate Mother's parental rights ultimately occurred on August 10 and August 28, 2020. At the outset of this hearing, the district court took judicial notice of D.M. and B.M.'s father's criminal case for committing aggravated indecent liberties against L.M. in 2015. Although the court did not state what criminal charges R.L. faced, it took judicial notice of R.L.'s criminal case stemming from L.M.'s and D.M.'s sexual abuse allegations. Furthermore, the court took judicial notice of the records and files of L.M.'s, D.M.'s, and B.M.'s current CINC cases as well as L.M.'s and D.M.'s 2014 CINC cases, which had been closed after Mother successfully completed her case plan tasks in those prior cases.

At the termination hearing, the State called two Saint Francis caseworkers who had worked on B.M.'s CINC case. In addition to testifying about Mother's general noncompliance with her case plan tasks, the first Saint Francis caseworker, Kimberly Alarcon, testified that she believed Mother was still in a romantic relationship with R.L. because she had seen Mother's van outside of R.L.'s house and R.L.'s truck outside of Mother's apartment. Alarcon explained that on January 15, 2020, February 4, 2020, and May 27, 2020, she took photos of the van that she believed belonged to Mother in front of R.L.'s house. Alarcon testified that on July 6, 2020, she took photos of the truck that she believed belonged to R.L. outside of Mother's apartment. Alarcon also testified that on January 21, 2020, she took photos of the truck that she believed belonged to R.L. in Saint Francis' office parking lot. Alarcon alleged that Mother drove R.L.'s truck to her scheduled case planning conference at Saint Francis' office. Alarcon's photos—State's Exhibits 1-5—were admitted into evidence.

During her cross-examination, Alarcon conceded that she never knocked on either Mother's apartment or R.L.'s house to confirm that they were actually together inside

8

their respective residences. Nonetheless, Alarcon seemed confident that Mother and R.L. were together when she took her photos, noting that Mother's van was easily recognizable based on visible damage to its right side.

The second Saint Francis caseworker who testified on the State's behalf, Santana Treto, also testified about her belief that Mother remained in a relationship with R.L. Although she had never seen Mother and R.L. together, she alleged that Saint Francis received information that Mother asked her co-workers for money to hire an attorney to represent her in L.M.'s, D.M.'s, and B.M.'s CINC cases but then used the money she fundraised to bond R.L. out of jail. She explained that Mother's attempt to fundraise for an attorney, in and of itself, was questionable because the district court had already appointed an attorney to represent Mother in her daughters' CINC cases. Treto also testified that she believed Mother allowed her daughters to have contact with R.L. for two other reasons: (1) because the girls had mentioned speaking to R.L. despite Mother's case plan task prohibiting Mother from allowing such contact and (2) because Mother gave L.M. a cell phone so they could speak together secretly despite Mother's case plan task prohibiting Mother from having unmonitored contact with her daughters.

Mother's case against the State's termination of her parental rights over D.M. and B.M. consisted of her testimony and her co-worker's testimony. Mother's longtime friend and co-worker testified that she had no memory of Mother ever raising money to bail R.L. out of jail. She also testified that if Mother had ever tried to raise money to bail R.L. out of jail, she would have known about it.

Likewise, Mother denied bonding R.L. out of jail on September 7, 2019, but did admit that she took R.L. to "sign [up] for probation" two days later, on September 9, 2019. She explained that she took R.L. to the probation office because she and R.L. did not know that they were barred from having contact with each other until someone at the

9

probation office told them they could not be together. And she testified that upon learning this information, she and R.L. parted ways and had not seen each other since.

When confronted with Alarcon's photos, State's Exhibits 1-5, Mother denied that they depicted R.L.'s truck at her apartment and her van at R.L.'s house. Nonetheless, while reviewing State's Exhibit 3, Mother conceded that State's Exhibit 3 depicted a van "like" her van in front of R.L.'s house. Moreover, when asked whether she drove R.L.'s truck to her case planning conference at Saint Francis' office on January 21, 2020, Mother did not deny driving R.L.'s truck. Instead, she responded that she could not remember whether she drove R.L.'s truck to her case planning conference on that date.

Mother admitted that she knew about L.M.'s and D.M.'s sexual abuse allegations against R.L. by mid-June 2019. And she indicated that she continued to live with R.L. after learning about those allegations in mid-June 2019 simply because nobody had told her yet that she should not be in contact with R.L. When asked whether she believed L.M.'s and D.M.'s sexual abuse allegations against R.L., Mother explained that she initially believed their allegations but later doubted them. Although Mother did not explicitly testify when she first started to doubt L.M.'s and D.M.'s sexual abuse allegations against R.L., she alleged that sometime after L.M. and D.M. entered DCF custody, they told her "[i]t was all lies" they manufactured "to have more liberties with their friends." Mother also testified that this was why she brought L.M. and D.M. to the local district attorney's office during their August 5, 2019 visitation. She explained that since L.M. and D.M. had told her their sexual abuse allegations against R.L. were lies, she wanted the district attorney "[t]o take away the charges" against R.L.

Prior to the conclusion of the hearing, Mother gave the district court seven letters written by D.M. which she wanted the court to read. After reading them, the court met with L.M., D.M., and the guardian ad litem in chambers, but on the record. Those

10

conversations related to the outcomes which L.M. and D.M. wished to see in the case but did not specifically bear on B.M.'s situation.

At the end of the hearing, the parties made closing arguments to the district court. Of note, during the State's closing argument, the State's attorney suggested for the first time that Mother was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(3) based on L.M.'s and D.M.'s 2014 CINC cases. Then, once the parties concluded their closing arguments, the district court issued rulings from the bench concerning D.M. and B.M. At the outset of its remarks, the district court reflected on the discussion which occurred during the chambers meeting with the two older girls and praised their resilience and concern for their younger sister, B.M.

Concerning B.M., the district court made the following findings:

"Based on the evidence that's been presented over the two days that this Court has heard this matter, I do find that there is sufficient evidence to terminate . . . the parental rights of [Mother over B.M.].

. . . .

"[I]n regards to [B.M.], I . . . find that [Mother] has failed to demonstrate to the Court that she is willing or able to make substantial changes in her life that have convinced the Court that she would be able to adequately protect [B.M.] and provide the kind of parental home and environment that [B.M.] needs, and I terminate her parental rights on [B.M.], as well, again, based on the statutes set forth in the [State's] Petition: Pursuant to K.S.A. 38-2269(b)(7), failure of reasonable efforts made by public or private agencies to rehabilitate the family; K.S.A. 38-2269(b)(8), lack of effort on the part of the parent to adjust . . . the parent's circumstances, conduct, or conditions to meet the needs of the child; [K.S.A.] 38-2269(c)(1), failure to assure care of the child in the parental home when able to do so; K.S.A. 38-2269(c)(2), failure to maintain regular visitation, contact, or communication with the child or the custodian of the child; and, K.S.A. 38-2269(c)(3), failure to carry out a reasonable plan approved by the Court directed towards the integration for the child into a parental home.

11

"Therefore, I am ordering that [B.M.] remain placed in DCF custody and that . . . the agency begin the process for adoption.

"I am directing that [B.M.] be allowed to continue to have contact with her two older sisters. I am finding that this is in the best interest[s] of the child based on her age, her circumstances, and the likelihood that neither parent's circumstances [nor] behavior will change in the foreseeable future."

Although not directly pertinent to this appeal, the district court also made findings resulting in the termination of Mother's parental rights to D.M., and expressed the hope that a permanent custodianship could be established for her.

In making this short and bare recitation of its findings, the district court did not explain what evidence it found persuasive as to each statutory factor. As an aside, we note that a district court performs a real service to the parties, their counsel, and to reviewing appellate courts when it details not only its findings, but what facts in the record it relied upon in making those findings. If this is not done, as in this case, it requires that the record be searched by others to determine if there is clear and convincing evidence which supports the district court's findings. Since the great majority of termination of parental rights orders are appealed to us by one or both parents, a district court's failure to give reasons for its rulings substantially increases the workload for the parties and the appellate courts and runs the risk of having the district court's rulings misunderstood on appeal. But when a district court discusses the evidence it relied upon in making its findings, it provides a helpful roadmap for determination as to whether there is clear and convincing evidence which undergirds the court's decision— the central question Mother raises here.

Following the district court's termination of her parental rights over B.M., Mother appealed this ruling outside of K.S.A. 2020 Supp. 60-2103(a)'s 30-day deadline to appeal the termination of her parental rights. See K.S.A. 2020 Supp. 38-2273(c). Yet, because our Supreme Court had suspended all statutes of limitations and statutory time standards

12

and deadlines applying to the conduct or processing of judicial proceedings when Mother filed her notice of appeal, this court has jurisdiction over Mother's appeal. See Kansas Supreme Court Administrative Order 2021-PR-009, effective January 26, 2021 (incorporating by reference all previous administrative orders suspending deadlines); see also *In re Marriage of Evans*, No. 122,924, 2021 WL 1149385, at *6 (Kan. App. 2021) (unpublished opinion) (considering father's otherwise untimely motion timely based on our Supreme Court's administrative orders suspending statutory deadlines because of COVID-19).

## ANALYSIS

On appeal, Mother argues that the district court erred in four ways when terminating her parental rights. First, she argues that the district court violated her procedural due process rights by finding that she was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(3) because the State gave her no notice of its intent to argue that she was presumptively unfit under any factor of K.S.A. 2020 Supp. 38-2271(a). Second, Mother argues that clear and convincing evidence did not support the district court's remaining unfitness findings as required under K.S.A. 2020 Supp. 38-2269(a). Third, Mother argues that the court erred in finding that Mother's unfitness was unlikely to change in the foreseeable future, under K.S.A. 2020 Supp. 38-2269(a). Fourth, Mother argues that the district court failed to adequately consider whether the termination of her parental rights was in B.M.'s best interests as required under K.S.A. 2020 Supp. 38-2269(g)(1).

We will first review the law that applies in termination of parental rights cases and then address each of Mother's issues in turn.

*Applicable law*

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). But like all constitutional rights, even fundamental ones, this right is not without limits. To terminate parental rights, the State may establish that a parent is presumptively unfit under one of K.S.A. 2020 Supp. 38-2271(a)'s factors establishing presumptive unfitness. For instance, under K.S.A. 2020 Supp. 38-2271(a)(3), the State may establish that a parent is presumptively unfit by proving by clear and convincing evidence that "on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by K.S.A. 2020 Supp. 38-2202(d)(1), (d)(3), (d)(5) or (d)(11), and amendments thereto, or comparable proceedings under the laws of another jurisdiction." If the State seeks to establish a parent's unfitness under one of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors, however, the parent must be given the opportunity to rebut the presumption of unfitness by a preponderance of the evidence. K.S.A. 2020 Supp. 38-2271(b).

Moreover, K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors "must be applied in a manner that comports with procedural due process." *In re K.R.*, 43 Kan. App. 2d 891, 898, 233 P.3d 746 (2010). This means that when the State seeks to establish a parent's unfitness under one of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors, the State must provide that parent adequate notice of its intent to argue that he or she is presumptively unfit. And while the State's failure to provide a parent adequate notice of its intent to invoke one of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors does not necessarily violate that parent's procedural due process rights, the best practice is for the State to give a parent notice of its intent to invoke a presumptive unfitness factor before the evidentiary hearing on the termination of that parent's rights. See 43 Kan. App. 2d at 898-99.

14

However, the State need not rely on one of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors to terminate a parent's rights. It may also rely on K.S.A. 2020 Supp. 38-2269. Subsection (a) of K.S.A. 2020 Supp. 38-2269 states:

> "When the child has been adjudicated to a child in need of care, the court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

Subsection (b) of K.S.A. 2020 Supp. 38-2269 lists nine factors the district court must consider when analyzing whether a parent is unfit. For Mother's appeal, the most significant portions of K.S.A. 2020 Supp. 38-2269(b) are subsections (b)(7) and (b)(8). K.S.A. 2020 Supp. 38-2269(b)(7) provides that "[i]n making a determination of unfitness the court shall consider . . . [the] failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." And K.S.A. 2020 Supp. 38-2269(b)(8) provides that "[i]n making a determination of unfitness the court shall consider . . . [the] lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

Subsection (c) of K.S.A. 2020 Supp. 38-2269 lists an additional four unfitness factors that the district court must consider when the child is not in the parent's physical custody. In relevant part, K.S.A. 2020 Supp. 38-2269(c) states that when the child is not in the parent's physical custody, the district court must consider whether the parent failed to do the following:

> "(1) Fail[ed] to assure care of the child in the parental home when able to do so;
> "(2) fail[ed] to maintain regular visitation, contact or communication with the child or with the custodian of the child; [and]

15

"(3) fail[ed] to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Importantly, the existence of any single K.S.A. 2020 Supp. 38-2269(b) or (c) factor "'standing alone may, but does not necessarily, establish grounds for termination of parental rights.'" K.S.A. 2020 Supp. 38-2269(f); *In re J.S.*, 42 Kan. App. 2d 113, 120, 208 P.3d 802 (2009).

At the next step, if the district court finds that there is clear and convincing evidence of a parent's unfitness and that the unfitness is unlikely to change as stated under K.S.A. 2020 Supp. 38-2269(a), then K.S.A. 2020 Supp. 38-2269(g)(1) requires the district court to consider whether termination of that parent's rights is in the best interests of the child based on a preponderance of evidence. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). In making the best interests finding, the district court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1). If the termination of the parent's rights is in the best interests of the child's physical, mental, or emotional needs, then the district court must terminate the parent's rights over the child. K.S.A. 2020 Supp. 38-2269(g)(1).

When considering a parent's challenge to the district court's unfitness finding for clear and convincing evidence, we must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, the court is convinced that a rational factfinder could have found the determination to be highly probable." *In re K.R.*, 43 Kan. App. 2d at 896. In contrast, we review a parent's challenge concerning the district court's best interests finding for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). A judicial action constitutes an abuse of discretion if the decision is based on an error of law, an error of fact, or when no reasonable person would agree with the district court. 50 Kan. App. 2d at 1116.

16

When a parent argues that the district court made some additional factually erroneous findings to support its best interests finding, we review the district court's additional findings for substantial competent evidence. 50 Kan. App. 2d at 1116. Substantial competent evidence exits if the evidence allows a reasonable person to accept the validity of a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). Furthermore, to the extent Mother argues that the district court violated the plain language of K.S.A. 2020 Supp. 38-2269 or K.S.A. 2020 Supp. 38-2271, such arguments involve questions of law over which we have unlimited review. *In re K.R.*, 43 Kan. App. 2d at 896.

*Mother's complaint about the presumptive unfitness factor*

In her first argument, Mother asserts that the district court violated her procedural due process rights by finding her presumptively unfit under one of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors. Although Mother never clarifies what K.S.A. 2020 Supp. 38-2271(a) presumptive unfitness factor the district court applied, it is readily apparent that Mother believes the district court applied K.S.A. 2020 Supp. 38-2271(a)(3)'s factor allowing the district court to make a presumptive unfitness finding when a parent has previously had at least two children not in his or her custody adjudicated as children in need of care. Mother's argument here hinges on the State's failure to provide her adequate notice that it was going to allege that she was presumptively unfit based on L.M.'s and D.M.'s 2014 CINC cases. Mother argues that she had no notice that the State was going to argue that she was presumptively unfit until it mentioned this presumptive unfitness factor during closing arguments. She therefore argues that the State's failure to tell her it was going to allege that she was presumptively unfit until closing arguments violated her procedural due process rights. And she, in turn, also argues that the district court could not find her presumptively unfit as stated under K.S.A. 2020 Supp. 38-2271(a)(3) without violating her procedural due process rights. See

*In re K.R.*, 43 Kan. App. 2d at 898 (discussing minimum procedural due process required to invoke one of K.S.A. 2020 Supp. 38-2271[a]'s presumptive unfitness factors).

From the record, it is true that the State did not provide notice to the parties or to the district court prior to closing arguments that it wished to rely on a statutory presumption of unfitness based upon two prior CINC cases for the older children. But the State counters that, despite this omission, Mother's argument is meritless because the district court never relied on any of K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors when it terminated Mother's parental rights. A review of the district court's unfitness findings establishes that the State's argument is correct.

Here, the district court relied only on K.S.A. 2020 Supp. 38-2269, not any of the K.S.A. 2020 Supp. 38-2271(a) presumptive unfitness factors, when terminating Mother's parental rights over B.M. In fact, at the termination hearing, the district court explicitly stated that it was terminating Mother's parental rights over B.M. based on the evidence establishing Mother's unfitness under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), and (c)(1)-(3) without ever discussing K.S.A. 2020 Supp. 38-2271(a)'s presumptive unfitness factors. Thus, the State's inapt closing argument about K.S.A. 2020 Supp. 38-2271(a)(3)'s presumption of unfitness obviously had no bearing on the district court's ultimate decision to terminate Mother's parental rights over B.M. Consequently, Mother's argument that the district court violated her procedural due process rights is meritless.

*Clear and convincing evidence of unfitness that was unlikely to change in the foreseeable future*

Mother's main argument, encompassing both her second and third arguments on appeal, is that clear and convincing evidence did not support the district court's unfitness findings, and that her unfitness was unlikely to change in the foreseeable future. In essence, she asserts that insufficient evidence supported most of the factors that the

18

district court relied on under K.S.A. 2020 Supp. 38-2269(b) and (c) to find her unfit to parent and unlikely to become fit to parent in the foreseeable future. The State responds that the record on appeal undermines Mother's interpretation of the evidence supporting her arguments. Just as with Mother's first argument, a review of the district court's unfitness findings supports the State's position.

At the outset, we note that in Mother's appeal she does not challenge the district court's unfitness finding under K.S.A. 2020 Supp. 38-2269(c)(1). To review, the district court found that Mother was unfit to parent B.M. and unlikely to become fit to parent her in the foreseeable future for the following five reasons:

(1)   because it found that Saint Francis' reasonable efforts had failed to rehabilitate Mother with B.M. as stated under K.S.A. 2020 Supp. 38-2269(b)(7);

(2)   because it found that Mother had failed to adjust her circumstances, conduct, or conditions to meet B.M.'s needs as stated under K.S.A. 2020 Supp. 38-2269(b)(8);

(3)   because it found that Mother had failed to assure B.M.'s care in her parental home when able to do so as stated under K.S.A. 2020 Supp. 38-2269(c)(1);

(4)   because it found that Mother had failed to maintain regular visitation, contact, or communication with B.M. as stated under K.S.A. 2020 Supp. 38-2269(c)(2); and

(5)   because it found that Mother had failed to carry out a reasonable reintegration case plan that it had approved as stated under K.S.A. 2020 Supp. 38-2269(c)(3).

In her brief, although Mother challenges the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3), Mother's brief never addresses the district court's unfitness finding under K.S.A. 2020 Supp. 38-2269(c)(1).

Yet, because K.S.A. 2020 Supp. 38-2269(f) provides that the existence of any unfitness factor under K.S.A. 2020 Supp. 38-2269(b) or (c) may establish a parent's unfitness, Mother needed to challenge each of the district court's unfitness findings to undermine its termination of her parental rights over B.M. As a result, Mother's failure to challenge the district court's specific unfitness finding under K.S.A. 2020 Supp. 38-2269(c)(1) is fatal to her argument that clear and convincing evidence did not support the district court's overall finding that she was unfit to parent and unlikely to become fit to parent in the foreseeable future. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (holding that issue not briefed by appellant is deemed waived and abandoned).

But there is an additional serious problem with the adequacy of Mother's brief challenging the district court's findings on those factors she does address. Kansas Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35) requires an appellant to cite where in the record this court may find each factual statement supporting his or her arguments. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013) (relying on Rule 6.02[a][5] to hold that "[w]hen facts are necessary to an argument, the record must supply those facts and a party relying on those facts must provide an appellate court with a specific citation to the point in the record where the fact can be verified"). Previously, our Supreme Court has held that when an appellant violates Rule 6.02(a)(5), we may presume that any factual statement without citation to the record has no support in the record. 296 Kan. at 644. Thus, for us to even consider the facts as alleged by Mother as true, her brief must include citations to the record for each factual statement in support of her arguments.

Regrettably, Mother has included no citations to the record for any of her factual statements in the analysis section of her brief. This constitutes a clear violation of Rule 6.02(a)(5). As a result, we may presume that each of Mother's factual statements in support of her contention that clear and convincing evidence did not support the district court's unfitness findings are without support in the record on appeal. And because we

may presume that each of Mother's factual statements is unsupported in the record, Mother cannot establish that the district court's unfitness findings were not supported by clear and convincing evidence.

But even if we would ignore the fact that Mother's arguments are inadequately briefed, her specific complaints about the district court's unfitness findings rely on a misconstruction of certain evidence in the record on appeal.

In her brief, Mother repeatedly contends that the district court erred by finding her unfit to parent and unlikely to become fit to parent in the foreseeable future for two reasons: (1) because she completed each of her case plan tasks directed toward B.M.'s reintegration and (2) because the State merely relied on circumstantial evidence indicating that she remained in contact with R.L. In fact, in her brief, each of Mother's specific complaints about the district court's findings that she is unfit to parent and unlikely to become fit to parent in the foreseeable future as stated under K.S.A. 2020 Supp. 38-2268(b)(7), (b)(8), (c)(2), and (c)(3) involve these contentions. As a result, at the end of her brief, Mother asserts that we should reverse the termination of her parental rights over B.M. because the district court's unfitness findings, which relied on her failure to complete certain case plan tasks and continued contact with R.L., were not supported by clear and convincing evidence.

First, Mother's argument that she had completed all of her case plan tasks directed towards B.M.'s reintegration is simply not correct. Saint Francis' November 8, 2019 court report, which was submitted in preparation for Mother's November 20, 2019 permanency hearing, stated that Mother was not complying with any of her case plan tasks. Although Mother had started an age-appropriate parenting class, had started attending individual therapy, and had signed releases allowing Saint Francis to monitor her progress in her parenting class and individual therapy in late November 2019, when the State petitioned to terminate Mother's parental rights on January 31, 2020, Mother was still not in

21

compliance of many of her case plan tasks. These included her tasks of taking and then following the recommendations of her mental health assessment, using appropriate consequences when disciplining her daughters, and maintaining regular contact with Saint Francis. And as of her April 27, 2020 case planning conference, which appears to be Mother's final case planning conference before the district court terminated her parental rights over B.M., Mother had still not followed the recommendations of her mental health assessment. Also, Saint Francis' report from Mother's April 27, 2020 case planning conference indicate that Mother never complied with her case plan tasks of using appropriate consequences when disciplining her daughters and having all persons residing with her complete background checks; instead, these case plan tasks were discontinued upon the district court's orders that Mother's visitations with L.M., D.M., and B.M. be limited to monitored phone calls.

Consequently, Mother's contention that she completed all of her case plan tasks directed towards B.M.'s reintegration is not supported by the record. The State presented clear and convincing evidence that she did not complete all of her case plan tasks. As a result, the district court properly relied on Mother's failure to complete all of her case plan tasks in finding her unfit to parent and unlikely to become fit to parent in the foreseeable future.

Second, regarding Mother's contention that only circumstantial evidence supported that she remained in contact with R.L., it is first important to note that Mother did not have any case plan tasks that explicitly prevented her from having contact with R.L. Instead, her case plan tasks prevented her from allowing R.L. to have contact with L.M., D.M., and B.M. and from allowing anybody with "person offenses" to reside in her apartment.

Still, according to Mother's own testimony at the termination hearing, Mother understood that she was not supposed to have any contact with R.L. as of September 9,

2019. Again, at the termination hearing, she testified that on September 9, 2019, someone at R.L.'s "probation" office told her that she and R.L. could not be together. Yet, regardless of this fact, Mother should have known that her continued contact with R.L. would not advance her reintegration efforts with B.M. given (1) that during the pendency of B.M.'s CINC case, R.L. faced criminal charges for his alleged sexual touching of L.M. and D.M. and (2) that her case plan tasks barred her from allowing R.L. any contact with L.M., D.M., and B.M. Thus, although Mother's case plan tasks did not explicitly prohibit her from having contact with R.L., Mother clearly knew she was not supposed to be having contact with R.L. throughout the pendency of B.M.'s CINC case. And for this reason, assuming the evidence established Mother's continued contact with R.L., the district court could weigh Mother's continued contact with R.L. against Mother in making its unfitness findings.

As for Mother's specific complaints about the State's evidence indicating that she was still in contact with R.L., Mother's complaints involve the quality of the State's evidence. She essentially asserts that because Saint Francis often failed to verify some of the things it alleged, the State failed to present clear and convincing evidence that she remained in contact with R.L. For example, in her brief, she stresses that nobody from Saint Francis ever verified that she bonded R.L. out of jail. She also stresses that Alarcon never knocked on the door of her apartment or R.L.'s house to confirm that they were together at the times Alarcon believed she saw Mother's van in front of R.L.'s house and R.L.'s truck in front of Mother's apartment.

Mother's complaints about the quality of the State's evidence have some merit. The State's case in support of the termination of Mother's parental rights over B.M. did rely largely on circumstantial evidence that Mother remained in contact with R.L. throughout the pendency of B.M.'s CINC case. Also, much of Alarcon's and Treto's testimony on behalf of the State involved hearsay statements from unidentified declarants about Mother's continuing contact with R.L. Simply put, because the State's termination case

23

relied heavily on Mother's continued contact with R.L despite knowing about L.M.'s and D.M.'s sexual abuse allegations, the State should have done a better job documenting Mother's continued contact with R.L. In particular, the State's failure to present any evidence about whether R.L. was ultimately convicted of any crime stemming from L.M.'s and D.M.'s sexual abuse allegations is troubling.

The above weaknesses in the State's evidence concerning Mother's continued contact with R.L., however, do not necessitate the reversal of the district court's termination of Mother's parental rights over B.M. for a few reasons.

First, although Mother complains about the quality of the State's evidence supporting her continued contact with R.L., Mother's own failure to include certain information in the record on appeal has limited our review. In particular, Mother's failure to include the October 23, 2019 review hearing transcript and the November 20, 2019 permanency hearing transcript in the record on appeal raises problems because the journal entries of those hearings indicate that Mother's continued contact with R.L. were discussed at those hearings in some depth.

For instance, the October 23, 2019 review hearing journal entry states that the district court found that D.M.'s and B.M.'s reintegration with Mother may no longer be viable based on Saint Francis' court report and its in-chambers conversation with L.M., D.M., and the guardian ad litem. Because Saint Francis' court report accused Mother of bonding R.L. out of jail and bringing L.M. and D.M. to the local district attorney's office to recant their sexual abuse allegations against R.L., there can be little doubt that information pertinent to Mother's apparent continued contact with R.L. was discussed at the October 23, 2019 review hearing.

Similarly, because the November 20, 2019 permanency hearing journal entry states that the district court listened to Mother's testimony before finding that D.M.'s and

B.M.'s reintegration with Mother was no longer viable, it is highly likely that Mother answered questions about her alleged continued contact with R.L. in light of L.M.'s and D.M.'s sexual abuse allegations against R.L. at the permanency hearing.

Accordingly, although Mother has correctly pointed out some weaknesses with the State's evidence supporting the termination of her parental rights over B.M., it is difficult to adequately gauge those weaknesses because Mother has failed to include important hearing transcripts in the record on appeal. Because Mother failed to include these hearing transcripts in the record on appeal, we may presume that the district court's unfitness findings were proper. See *City of Wichita v. Eisenring*, 269 Kan. 767, 784, 7 P.3d 1248 (2000) (presuming district court's decision was proper when City failed to furnish district court with pertinent rulings in record on appeal).

Second, the fact that the State relied on circumstantial evidence to prove Mother's continued contact with R.L. does not mean that the State's evidence supporting Mother's continued contact with R.L. was inadequate. It is a well-known rule that "[a]ny material fact may be proven not only by direct testimony, but also by indirect or circumstantial evidence, or by a combination of both." *In re M.S.*, 56 Kan. App. 2d 1247, 1258, 447 P.3d 994 (2019). Thus, to prove that the State did not provide the district court with clear and convincing evidence of her continued contact with R.L., Mother must do more than challenge the State's evidence as simply being circumstantial.

But in her brief, Mother does just that. She argues that the State did not provide clear and convincing evidence of her continued contact with R.L. simply because the State presented no direct evidence of her continued contact with R.L. But because the State could rely entirely on circumstantial evidence to support the termination of Mother's parental rights over B.M., Mother's complaint about the State's evidence of her continued contact with R.L. being inadequate because it was circumstantial is meritless.

25

Third, the State's circumstantial evidence of Mother's continued contact with R.L. was clear and convincing. Again, both Alarcon and Treto testified about receiving information indicating that Mother remained in contact with R.L. Alarcon also specifically testified about taking photos—State's Exhibits 1-5—of what she believed was Mother's van in front of R.L.'s house and R.L.'s truck in front of Mother's apartment on January 15, 2020, February 4, 2020, May 27, 2020, and July 6, 2020. Although Mother denied that the van shown in State's Exhibits 1-5 was her van, she conceded that the van in State's Exhibit 3 looked like her van in front of R.L.'s house. Furthermore, State's Exhibits 3 and 4 depict a van with visible damage on its right side, and Alarcon testified about Mother's van having visible damage on its right side.

In addition to the State's evidence supporting Mother's continued contact with R.L., Mother's own testimony indicated that she remained in contact with R.L. after she knew she should not be in contact with R.L. Again, at the termination hearing, Mother testified that she did not have contact with R.L. after learning they were not supposed to be together on September 9, 2019, at R.L.'s probation office. When asked whether she drove R.L.'s truck to her January 21, 2020 case planning conference at Saint Francis' office, however, Mother simply responded that she could not remember if she drove R.L.'s truck to that case planning conference. Plainly, this response is problematic because, assuming Mother's testimony about not having any contact with R.L. after September 9, 2019, is true, Mother should have known for certain whether she drove R.L.'s truck to her January 21, 2020 case planning conference.

Therefore, despite Mother's complaints otherwise, significant circumstantial evidence supported her continued contact with R.L. When considering this circumstantial evidence in the light most favorable to the State, a rational fact-finder could conclude that Mother remained in contact with R.L. throughout the duration of B.M.'s CINC case. As a result, the district court's reliance on Mother's continued contact with R.L. in finding her unfit and unlikely to become fit in the foreseeable future was proper.

Since we have concluded that Mother did not complete all of her case plan tasks directed towards B.M.'s reintegration and that significant circumstantial evidence supported Mother's continued contact with R.L. throughout the pendency of B.M.'s CINC case, we now consider Mother's specific arguments about clear and convincing evidence not supporting the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3). Once again, Mother's underlying complaints about the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3) are not persuasive.

To begin, Mother's complaints about the district court's finding (1) that she was unfit to parent and unlikely to become fit to parent in the foreseeable future because she failed to adjust her circumstances, conduct, or conditions to meet B.M.'s needs as stated under K.S.A. 2020 Supp. 38-2269(b)(8) and (2) that she failed to carry out a reasonable reintegration case plan that it had approved as stated under K.S.A. 2020 Supp. 38-2269(c)(3) hinge entirely on her contentions that she completed all her case plan tasks and that the State's circumstantial evidence did not establish her continued contact with R.L. For the reasons we have just discussed, those predicate contentions lack merit. By extension, Mother's complaints about the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(8) and (c)(3) also fail.

As for Mother's argument that insufficient evidence supported the district court's unfitness finding that Saint Francis' reasonable efforts had failed to rehabilitate her with B.M. as stated under K.S.A. 2020 Supp. 38-2269(b)(7), Mother primarily asserts that clear and convincing evidence did not support this unfitness finding because the State presented only circumstantial evidence to support her continued contact with R.L. Yet, in addition to this unpersuasive assertion, Mother also argues that Saint Francis had not made reasonable efforts to rehabilitate her and B.M. Although not entirely clear, Mother seemingly contends that Saint Francis' rehabilitation efforts were unreasonable because

27

Saint Francis punished her for giving L.M. an unauthorized cellphone and because they discontinued her in-person visits with her daughters.

But Mother's accusation is not supported by the record on appeal. To the contrary, from what is available in the record, it appears that the district court ruled that Mother could only have monitored phone calls with L.M., D.M., and B.M. sometime in late October 2019 after Saint Francis received information that Mother remained in contact with R.L. and that Mother had taken L.M. and D.M. to the local district attorney's office to recant their sexual abuse allegations against R.L. Thus, Mother's complaint about insufficient evidence supporting the district court's unfitness finding under K.S.A. 2020 Supp. 38-2269(b)(7) is unconvincing.

Turning to Mother's contention that insufficient evidence supported the district court's unfitness finding that she failed to maintain regular visitation, contact, or communication with B.M. as stated under K.S.A. 2020 Supp. 38-2269(c)(2), Mother argues that clear and convincing evidence did not support this unfitness finding because she maintained regular visitation, contact, and communication with B.M. throughout the pendency of B.M.'s CINC case. In making this argument, Mother implies that the only evidence supporting the district court's finding that she failed to maintain regular visitation, contact, or communication with B.M. was a Saint Francis' caseworker's complaint about L.M. and D.M. spending their in-person visits with Mother on their cell phones. But Mother's insinuation is not true.

While a caseworker reported that L.M. and D.M. spent most of their in-person visitations with Mother on their cell phones, this was not the only evidence supporting the district court's finding that Mother failed to maintain regular visitation, contact, or communication with B.M. Instead, the main evidence supporting Mother's failure to maintain regular visitation, contact, or communication with B.M. comes from the reports filed by Saint Francis, which indicate that Mother failed to maintain regular contact with

them after August 6, 2019. Moreover, although it seems that Mother regularly attended her in-person visitations with B.M. when she was allowed to do so, it also seems that Mother had no phone calls with B.M. after the district court limited Mother's contact with L.M., D.M., and B.M. to monitored phone calls in late October 2019.

Most compellingly, the evidence before the district court indicated that Mother had no contact with B.M. whatsoever during the 10 months leading up to the termination hearing. Consequently, Mother's argument that only a caseworker's observation about L.M. and D.M. being on their cell phones during their in-person visitations with Mother supported the district court's unfitness finding under K.S.A. 2020 Supp. 38-2269(c)(2) is unconvincing.

Additionally, each of Mother's specific complaints about the lack of clear and convincing evidence supporting the district court's unfitness findings ignores the evidence submitted at the termination hearing. Once again, when DCF obtained custody of B.M., she had just turned four years old. According to B.M.'s intake papers, before she entered DCF custody, she had lived with her babysitter since she was two-and-a-half months old. Then, after B.M. entered DCF custody, DCF contracted with Saint Francis to provide case planning services for Mother and B.M. And after this, Saint Francis created case plan tasks for Mother that were directed toward B.M.'s reintegration into her custody and that were also approved by the district court. As previously addressed, however, clear and convincing evidence supported that Mother failed to comply and complete many of her case plan tasks. As we have noted, both the State's evidence and Mother's testimony supported that Mother remained in contact with R.L., the alleged sexual abuser of her two oldest daughters, throughout the pendency of B.M.'s 13-month CINC case while having no contact with B.M. the final 10 months of B.M.'s CINC case. Therefore, at the time of termination, B.M. had lived with her Mother less than three months of her life.

In short, when considering the preceding evidence in the light most favorable to the State, this evidence establishes that Saint Francis made reasonable efforts to rehabilitate Mother with B.M. but those efforts had failed, which justified the district court's findings under K.S.A. 2020 Supp. 38-2269(b)(7). The evidence also establishes that Mother failed to adjust her circumstances, conduct, or conditions to meet B.M.'s needs as stated under K.S.A. 2020 Supp. 38-2269(b)(8). The evidence also supports the district court's conclusion that Mother failed to maintain regular visitation, contact, or communication with B.M. as stated under K.S.A. 2020 Supp. 38-2269(c)(2). Likewise, the evidence justified the district court in finding that Mother failed to carry out a reasonable reintegration case plan that had been approved by it as stated under K.S.A. 2020 Supp. 38-2269(c)(3). And it establishes that Mother failed to assure B.M.'s care in her parental home when able to do so as stated under K.S.A. 2020 Supp. 38-2269(c)(1)— the unfitness finding that Mother has entirely abandoned on appeal. And to reiterate the most egregious fact concerning Mother and B.M., when considering the preceding evidence in the light most favorable to the State, the evidence supports that B.M. lived in Mother's parental home less than three months of her entire life.

Thus, to summarize, none of Mother's complaints about the lack of clear and convincing evidence supporting the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), (c)(1), and (c)(2) are persuasive to us. Furthermore, clear and convincing evidence otherwise supported each of the district court's unfitness findings. As a result, Mother has not proven that the district court erred in finding her unfit to parent B.M. and that she was unlikely to become fit to parent B.M. in the foreseeable future as required by K.S.A. 2020 Supp. 38-2269(a). Thus, we find the district court was correct in its finding that Mother was unfit to parent B.M. and unlikely to become fit to parent B.M. in the foreseeable future as meant under K.S.A. 2020 Supp. 38-2269(a).

*Whether termination was in B.M.'s best interests*

In her final argument on appeal, Mother asserts that the termination hearing evidence did not support the district court's finding that termination of her parental rights over B.M. was in B.M.'s best interests. According to Mother, the district court only gave passing consideration to B.M.'s physical, mental, and emotional health when it found that termination of her parental rights was in B.M.'s best interests.

To support her argument, Mother stresses that B.M. never appeared before the district court and complains that the guardian ad litem never met with L.M., D.M., or B.M. before the termination hearing. Mother further alleges that Saint Francis' court reports about B.M.'s well-being are unreliable because the Saint Francis caseworkers relied heavily on biased information provided by the foster parents, who have indicated that they are willing to adopt B.M. Mother argues that because of these adoption plans for B.M., the proposed adoptive parents could not have provided credible information about B.M.'s well-being. Additionally, in challenging the district court's best interests finding, Mother contends that the district court's finding is comparable to the district court's best interests finding in *In re K.R.*, 43 Kan. App. 2d at 904, which this court determined to be statutorily inadequate.

The State counters that Mother's argument is meritless because the district court complied with K.S.A. 2020 Supp. 38-2269(g)(1)'s requirement to "give primary consideration to the physical, mental and emotional health of the child." In the end, the State's argument is persuasive because Mother's arguments hinge on misconstruing the termination hearing evidence and the district court's best interests finding.

To begin with, although B.M. never appeared before the district court or at a case planning conference, this was because she was just four years old when she entered DCF custody and just five years old when the district court terminated Mother's parental rights.

31

At the termination hearing, the district court and the guardian ad litem both explicitly noted that B.M. was not present because of her youth. Thus, there was a legitimate explanation for B.M.'s absence.

Moreover, Mother's contention that the guardian ad litem never met L.M., D.M., or B.M. before the termination hearing is not true. Although it is unclear whether the guardian ad litem met with L.M., D.M., or B.M. outside of court, the guardian ad litem did meet with L.M. and D.M. at the June 19, 2019 temporary custody hearing and at the October 23, 2019 review hearing. Despite this fact, Mother never complained about the guardian ad litem's alleged lack of contact with L.M., D.M., or B.M. before the district court. Nor did she complain about any potential credibility issues with Saint Francis' reports on B.M.'s well-being before this appeal. Accordingly, Mother cannot raise these complaints for the first time on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011) (holding that arguments not raised before district court cannot be raised for first time on appeal).

Finally, Mother's comparison of her case to *In re K.R.* is flawed. In *In re K.R.*, the district court found that it was in the children's best interests to terminate the mother's parental rights for two reasons: (1) because her children needed permanency and (2) because her "'past actions reflect[ed] an inability to carry through with her day-today obligations for the benefit and best interests of [the children].'" 43 Kan. App. 2d at 904.

On appeal, K.R.'s mother argued that these best interests findings did not comply with K.S.A. 2009 Supp. 38-2269(g)(1)'s requirement to consider whether termination of her parental rights was in the best interests of her children's physical, mental, and emotional health. Ultimately, a panel of our court agreed with the mother, rejecting the district court's best interests finding because it did not "weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." 43 Kan. App. 2d at 904. It

explained that in making a best interests finding, district courts "must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." 43 Kan. App. 2d at 904. "In other words, many parents may be unable to carry through with obligations that are in the best interests of their children, but this does not mean that termination of their parental rights would be in the best interests of their children.". 43 Kan. App. 2d at 904.

In reaching this holding, the *In re K.R.* court noted that the mother's termination case was unique because her children's guardian ad litem opposed termination of her parental rights. 43 Kan. App. 2d at 904-05. Likewise, it noted that the mother's termination case was unique because unlike the parents in many termination of parental rights cases, the mother faced "no allegations of abuse, no allegations of addiction, no allegation of filthy living conditions, no allegations of a dangerous relationship with a boyfriend, and no allegations of lack of interest in the children." 43 Kan. App. 2d at 904-05.

Here, the first major difference between Mother's termination case and *In re K.R.* is that Mother's termination case does not involve such unique facts. To begin with, the guardian ad litem in Mother's termination case supported the termination of Mother's parental rights over B.M. And unlike *In re K.R.*, Mother's termination case involved allegations of abuse, a dangerous relationship with a boyfriend, and evidence supporting Mother's disinterest in B.M. As to this last point, Mother's disinterest in B.M. was established by the evidence indicating that B.M. lived with her babysitter for most of her life until she was nearly four years old, that Mother initially wanted to voluntarily terminate her parental rights over B.M. in order to maintain her relationship with R.L., and that Mother did not maintain any contact with B.M. during the 10 months preceding her termination hearing.

33

Mother's case is further distinguishable from *In re K.R.* because, unlike the district court in *In re K.R.*, the district court in this case weighed the nature and strength of Mother and B.M.'s relationship as well as the trauma that termination might cause B.M. against the evidence supporting that termination of Mother's parental rights over B.M. was in B.M.'s best interests. The district court's best interests finding hinged in part on the likelihood that B.M. would become a sexual abuse victim like her older sisters should B.M. be returned to Mother's custody.

Once more, at the end of the termination hearing, the district court jointly considered whether it was in D.M.'s and B.M.'s best interests to have their Mother's parental rights terminated. In finding that it was in B.M.'s best interests to have Mother's parental rights terminated, the district court never explicitly found that R.L. sexually abused L.M. and D.M. All the same, some of the district court's comments establish that it implicitly found that R.L. had sexually abused L.M. and D.M. For instance, it referenced how strong L.M. and D.M. were "[d]espite what [they had] been through." Also, in giving DCF permanent custodianship of D.M., the district court told Mother that she "did not protect [her] daughter." Regardless, after implicitly finding that Mother had not protected her daughters from R.L.'s sexual abuse, the district court further found that L.M.'s and D.M.'s history as sexual abuse victims was "very important" to its best interests finding because their history as sexual abuse victims provided it with "insight into the things that could potentially happen to [B.M.]" should B.M. return to Mother's custody. It then found that B.M.'s age, B.M.'s circumstances, and Mother's unlikeliness of becoming fit to parent in the foreseeable future established that it was in B.M.'s best interests to have Mother's parental rights terminated.

As a result, Mother's case is very different from *In re K.R.* Unlike in *In re K.R.*, here, the district court's best interests finding hinged on the specific danger Mother posed to B.M. based on Mother's history of allowing sexual abusers around her daughters. The district court found that the likelihood and risk of Mother exposing B.M. to sexual abuse,

34

given her history of exposing her older daughters to sexual abusers, outweighed any risk of trauma to B.M.'s well-being from the termination of Mother's parental rights.

Therefore, although Mother contends that insufficient evidence supported the district court's finding that termination of her parental rights was in B.M.'s best interests, none of Mother's arguments about the district court's best interests finding have merit. In fact, the analysis required to address Mother's comparison of her termination case to *In re K.R.* proves that the district court adequately considered B.M.'s best interests because in making its best interests finding, the district court considered the benefits of placing B.M. up for adoption against the benefits of B.M. potentially attaining permanency with Mother considering Mother's ongoing issues, including her ongoing problem of allowing sexual abusers in her daughters' lives. As a result, the district court did not abuse its discretion by finding that termination of Mother's parental rights was in B.M.'s best interests.

CONCLUSION

In summary, we find Mother's complaints about the district court erroneously terminating her parental rights over B.M. to be unpersuasive. Although Mother argues that the district court violated her procedural due process rights by finding her presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(3), the district court never found that Mother was presumptively unfit under any K.S.A. 2020 Supp. 38-2271(a) presumptive unfitness factor. Also, although Mother alternatively asserts that clear and convincing evidence did not support the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269, there are numerous problems with Mother's arguments, including her contention that clear and convincing evidence did not support the district court's unfitness findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), and (c)(1)-(3). Finally, Mother's argument that insufficient evidence supported the district court's best interests finding hinged on misconstruing certain evidence and misapplying *In re K.R.*

35

Accordingly, we affirm the district court's termination of Mother's parental rights over B.M.

Affirmed.